# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMERICAN ROCK SALT COMPANY, LLC, | |
| Plaintiff, | No. 3:15-cv-01848 (MPS) |
| v. | |
| CARL S. WILSON, et, al., | |
| Defendants. | |

## Ruling on Defendants' Motion to Dismiss

## I. Introduction

In October 2013, after being selected in a public bidding process, American Rock Salt Company, LLC ("ARS"), entered into a contract with the State of Connecticut to supply rock salt for road maintenance during the winter season. (ECF No. 13 at ¶ 21) ("Compl.") Winter storms struck Connecticut early and often that year, and by January 2014, the State was clamoring for more rock salt for its roads. (Compl. at ¶¶ 27–28.) ARS attempted to meet the State's demand but, according its amended complaint, the State refused to let it cure a temporary supply deficiency, terminated the contract, and bought salt from a rival supplier. (*Id*. at ¶¶ 33–42.) ARS sued in state court, filed a claim with the State of Connecticut's Claims Commissioner, and also filed this federal action. (*Id*. at ¶¶ 13–15.) Here, ARS sues three officials of the Connecticut Department of Administrative Services ("DAS") in their individual and official capacities, claiming that they violated its rights under the Due Process and Equal Protection Clauses of the federal constitution

and also violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq. ("CUTPA").

The Defendants – Carol S. Wilson (Director of Procurement), Arlene Watson-Paulin (Contract Specialist), and Martin Anderson (Deputy Commissioner) – move to dismiss ARS's amended complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).   After carefully considering the parties' submissions, I grant that motion, because (1) the Eleventh Amendment bars the Court from exercising jurisdiction over the official capacity claims, including all but one of the requests for declaratory relief; (2) the procedural due process and takings claims, including the remaining request for declaratory relief, are unripe; in any event, (3) the amended complaint fails to allege facts (a) suggesting that ARS has a property interest in either avoiding termination of or receiving prompt payment under the contract, (b) supporting a "stigma plus" liberty interest claim, or (c) supporting a claim for violation of the Equal Protection Clause; and (4) in the absence of cognizable federal claims over which the Court has jurisdiction, I decline to exercise supplemental jurisdiction over the CUTPA claim.

## II.    ARS's Amended Complaint

### A.    Factual Allegations in Amended Complaint.

ARS sells crushed rock salt to state and local governments to maintain public highways during inclement weather.  (Compl. at ¶¶ 17–18.)  Around June, 2013, DAS solicited bids for road salt for its "Client Agency," the Connecticut Department of Transportation ("DOT").  ARS's bid won.  (*Id.* at ¶¶ 21–22.)  DAS awarded ARS contract no. 13PSX0161 (the "Contract"), which is dated October 15, 2013.  (*Id.* at ¶¶ 21–22; ECF No. 13-3 at 2.)  On September 20, 2013, ARS began shipping salt to "DOT stockpiles."   (Compl. at ¶¶ 23, 25.)

On January 2 and 3, 2014, severe weather struck Connecticut, prompting the Governor to send state employees home early and close state offices. (*Id.* at ¶ 29.) The weather coupled with Defendants' voluminous 2013-year-end salt requests caused ARS "difficulties" in delivering salt to the Defendants. (*Id.* at ¶ 33.) On January 7, 2014, Defendants Wilson and Watson-Paulin "demanded shipments" and issued a "notice of breach" to ARS asserting that ARS had breached the Contract because it had failed to deliver 8,619 tons of salt. (*Id.* at ¶¶ 30, 52.) The next day (January 8, 2014), ARS responded to Defendants' breach notice. (*Id.* at ¶ 33.) ARS explained that it was making "efforts to cure" the deficit and that the severe weather and the amount of salt Defendants had requested caused "difficulties." (*Id.*) ARS enclosed pictures of salt stockpiles to show that there was sufficient salt for the roads. (*Id.* at ¶ 34.) Defendants Wilson and Watson-Paulin, however, had already begun purchasing salt from other companies, including ARS's competitor, International Salt Co., LLC ("International"), and continued to do so during the "cure period which Plaintiff was allowed under the Contract." (*Id.* at ¶¶ 32, 35.)

On January 24, 2014, Ms. Wilson held a conference call with ARS to discuss ARS's strategy to cure the alleged salt deficiency. (*Id.* at ¶ 38.) Despite ARS's cure proposals, Defendants Wilson and Watson-Paulin had "pre-determined" to terminate the Contract. (*Id.* at ¶ 39.) Defendants Wilson and Watson-Paulin had been "engaged in communication with International and [had] agreed to take steps to transfer the Contract from ARS to International." (*Id.* at ¶ 59.) On January 24, 2014, Ms. Wilson sent ARS a termination letter with an effective date of January 28, 2014. (*Id.* at ¶ 41.) On the same day, Defendants issued supplements to the Contract, replacing ARS with International. (*Id.* at ¶¶ 61–65; ECF No. 13-4 at 2.) Under the supplements, Defendants paid International more per ton of salt than it had paid ARS. (*Id.* at ¶ 61.)

On January 27, 2014, ARS responded to Defendants' termination letter.  (*Id.* at ¶ 44.)  ARS argued that "force majeure events caused delays" and that DAS "purchased twice as much salt as the [alleged] deficit."  (*Id.*)  ARS provided Defendants[1] photographs to show the stockpiles were full.  ARS also accused Defendants of "purchas[ing] salt on the open market <u>prior</u> to the end of the contractual cure period." (*Id.* at ¶¶ 44–45) (emphasis in original).  ARS concluded by demanding nearly $900,000.  (*Id.*)  About a week later, Defendant Wilson responded with a letter that contained "disparaging statements" and "dispute[d]" ARS's facts.  Her letter did not acknowledge that ARS was owed nearly $900,000.  (*Id.* at ¶¶ 46–47.)

That summer, Defendants "charged back" $767,000 to ARS for the higher prices paid to International for road salt as a result of the contractual supplements.  (*Id.* at ¶ 63, 67.)  The Defendants calculated that after setting off the costs to cover for ARS's alleged salt deficiency, DAS owed $133,603.65 to ARS.  (*Id.* at ¶ 48.)  On June 19, 2014, DAS issued ARS a check for that amount.  (*Id.*)  "ARS was not allowed to present any arguments or evidence to dispute the set-off amount prior" to receiving the check.  (*Id.* at ¶ 49.)

The amended complaint also alleges that "Defendants demonstrated their improper motive by engaging in conduct designed to appear as though ARS was being given its contractually required opportunity to cure it[s] alleged breach while, in actuality, the Defendants had no real intent to allow ARS to continue to perform under the Contract …."  (*Id.* at ¶ 40.)  It accuses the Defendants of engaging in a "well-orchestrated scheme to default and then terminate ARS," and asserts that the claimed deficiency of 8,619 tons of rock salt was a "pretext[]" for terminating the Contract.  (*Id.* at ¶ 42.)  It also alleges that "Defendants contact[ed] ARS's other customers

---

[1] In several places in the amended complaint, as in this allegation, ARS refers to a singular "Defendant" without specifying to which of the three defendants the allegation refers. In such cases, I construe the plaintiff to be referring to all three defendants.

complaining about performance" (*id.* at ¶ 119), and "to discuss CT-DAS issues with ARS." (*Id.* at ¶ 146.)  Finally, it alleges, "[u]pon information and belief," that "CT-DAS officials had a close business relationship with International," which had not been the lowest bidder in the public bidding process, and that "Defendants …executed a pre-determined plan and agreement to 'steer' ARS's Contract to International." (*Id.* at ¶ 43.)

**B.     ARS's Legal Claims and Prayers for Relief**

ARS asserts the following causes of action against the Defendants: Violation of Fourteenth Amendment Substantive Due Process Rights (Count One), (Compl. at ¶¶ 70–86), Violation of Fourteenth Amendment Procedural Due Process Rights (Count Two), (*id.* at ¶¶ 87–113), Violation of Fourteenth Amendment Equal Protection Rights (Count 3), (*id.* at ¶¶ 114–124), Violation of Fifth Amendment Takings and Just Compensation Clause, as applicable to the State through the Fourteenth Amendment (Count Four), (*id.* at ¶¶ 125–136), and Violation of CUTPA (Count Five), (*id.* at ¶¶ 137–150.)  ARS seeks the following declaratory relief:  (i) for Count One, a declaratory judgment that ARS "has and had a protectable property interest in the Contract [a]ward and goods sold thereunder that should have been afforded substantive due process prior and subsequent to the deprivation by Defendants" (*id.* at p. 26); (ii)  for Count Two, a declaratory judgment that "[ARS's] property rights were deprived without adequate procedural due process and that the statutory scheme available is infirm for the ARS claims" (*id.*); and (iii) for Count Three, a declaratory judgment that "[ARS] was denied equal protection under the law and that the transfer of contractual property rights to International, a competitor, was inconsistent with applicable procurement guidelines [sic] resulted in improper and excessive set-off amount." (*Id.*)  Although it does not mention damages for the first three counts in the prayers for relief, ARS also seeks damages on these counts in the body of the amended complaint.  (Compl. at ¶¶ 85, 112, 124.)  For

5

Counts Four and Five, ARS seeks damages of $800,000 plus interest and $1,600,000, respectively. (*Id*. at p. 27.)

## III.  Legal Standards

A "case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011).  The "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).  "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

In evaluating whether a plaintiff has stated a claim for relief under Rule 12(b)(6), a court must "accept as true all factual allegations in the complaint and draw all reasonable inferences" in plaintiff's favor. *Cruz v. Gomez*, 202 F.3d 593, 596 (2d Cir. 2000).  A court need not accept conclusory allegations, however, and may allow the case to proceed only if the complaint pleads "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (2009).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."  *Id*.  A complaint must allege facts that "permit the court to infer more than the mere possibility of misconduct."  *Id*. at 679.

Furthermore, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint."  *Leonard F. v. Israel Disc. Bank of New*

*York*, 199 F.3d 99, 107 (2d Cir. 1999).  "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks and citation omitted).  "[W]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  *Id*. (internal quotation marks and citation omitted).

## IV.   Discussion

### A.   Rule 12(b)(1):  The Court Lacks Jurisdiction over the Official Capacity Claims and the Takings and Procedural Due Process Claims

#### 1.   The Eleventh Amendment Bars Most of ARS's Claims against the Defendants in their Official Capacities

ARS's claims asserted against the Defendants in their official capacities, including all of the claims for damages and most of the claims for declaratory relief, fail because they are barred by the Eleventh Amendment.

The Eleventh Amendment deprives federal courts of jurisdiction over suits by a citizen against a State, one of its agencies or departments, or a state employee in his official capacity unless (i) the state consents to suit, *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)), (ii) Congress abrogates Eleventh Amendment immunity under Section 5 of the Fourteenth Amendment, *Pennhurst State School & Hosp.*, 465 U.S. at 99, (iii) or the suit seeks "injunctive or declaratory relief challenging the constitutionality of a state official's actions in enforcing state law."  *Western Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18, 21 (2d Cir. 2004) (citation omitted, internal quotation marks, and internal brackets omitted); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit [against a state official] is, in all respects other than name, to be treated

as a suit against the entity.").  The exception for injunctive and declaratory relief – known as the *Ex Parte Young* exception, *Ex Parte Young*, 209 U.S. 123 (1908) – applies only to genuinely prospective relief.  *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (Supreme Court has declined to extend reasoning of *Ex Parte Young* to claims for retrospective relief because "remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law, whereas compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." (internal quotation marks omitted)).  Thus, plaintiffs may not sidestep the Eleventh Amendment bar by "fram[ing] their relief in prospective terms" when "the effect of what [is] sought would be entirely retrospective."  *Ward*, 207 F.3d at 119.

ARS does not allege that the State of Connecticut consented to be sued or that Congress has abrogated the State's immunity for these claims.  ARS's claims for monetary damages against the Defendants in their official capacities are therefore barred.  *See Kentucky*, 473 U.S. at 168–69.  So are most of its claims for declaratory relief.  All but one of those claims look backward, *i.e.*, they seek pronouncements by the Court that the State violated ARS's constitutional rights. Count One seeks a declaration that ARS "has and had a property interest" that "should have been afforded substantive due process prior and subsequent to the deprivation by Defendants" (Compl. p. 26); the addition of the present tense, "has," does not alter the retrospective character of this request for a declaration that the State violated ARS's substantive due process rights by terminating the Contract and failing to pay amounts ARS is allegedly owed.  Counts Two and Three similarly seek declarations that ARS's "property rights were deprived without adequate procedural due process …", that "ARS was denied equal protection under the law," and that "the transfer of contractual property rights to International … was

8

inconsistent with applicable procurement guidelines ….”  (*Id*.)[2]   None of these requests seek

prospective relief, and none of the factual allegations on which they are based plead an ongoing

violation of federal law.  These requests for declaratory relief are therefore barred by the

Eleventh Amendment.  *See Ward*, 207 F.3d at 119-20 (“[A] party armed with such relief from

the federal court and the doctrine of res judicata would have little left to do but appear in state

court, and employ the state court as a form of accounting proceeding for a retrospective (federal)

award of damages against the [S]tate,” thereby making “a partial end run around the Eleventh

Amendment’s bar on retrospective awards of monetary relief.” (internal quotation marks

omitted)).

### 2.     ARS’s Remaining Official Capacity Claim And Its Takings and Procedural Due Process Claims Are Unripe

One of ARS’s requests for a declaratory judgment is prospective: the request in Count

Two for a declaration that “the statutory scheme available” to challenge the deprivation of its

alleged property interest in the contract, i.e., the proceedings before the State of Connecticut’s

Claims Commissioner, “is constitutionally infirm for the ARS claims.”  (Compl. p. 26.)  Because

the amended complaint pleads that the proceedings before the Claims Commissioner are ongoing

(Compl. ¶¶ 13–16, 94), the Eleventh Amendment does not bar this claim.  Defendants challenge

this claim for declaratory relief on a different jurisdictional ground: ripeness.  (ECF No. 19 at

14.)  Specifically, Defendants argue that it is premature for this Court to determine the

constitutionality of the procedures in the proceeding before the Claims Commissioner until that

proceeding ends.  (*Id*.)  I agree and conclude that the pendency of the Claims Commissioner

---

[2] ARS’s request for a declaration that the State’s “transfer of contractual property rights” violated “applicable procurement guidelines” fails for the additional reason that it does not appear to be based on a violation of federal law.  *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) (“Clearly, a violation of state law is not cognizable under § 1983.”).

proceeding makes unripe not only the remaining claim for declaratory relief but also the entire procedural due process claim in Count Two and the Takings claim in Count Four.[3]

The ripeness analysis begins with *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), in which the Supreme Court articulated a two-prong ripeness test for claims under the Fifth Amendment's Takings Clause.[4]   A plaintiff bringing a claim in federal court alleging that a state or local government has taken his property in violation of the Fifth Amendment must show that (1) the relevant government entity has rendered a "final decision" on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure.  *Williamson Cnty. Reg'l Planning Comm'n*, 473 U.S. at 186 (holding that a takings claim is ripe when a "government entity charged with implementing the regulations has reached a final decision" and plaintiff "seek[s] compensation through the procedures the State has provided…").  In *Kurtz v. Verizon New York. Inc.*, 758 F.3d 506 (2d Cir. 2014), the Second Circuit extended the *Williamson County* ripeness test to procedural due process claims, holding that "*Williamson County* applies to due process claims arising from the same nucleus of facts as a takings claim." *Kurtz*, 758 F.3d at 516 (citing cases).  A takings claim and a due process claim have the "same nucleus of facts" when they are based on the "same set of facts."  *Id.* at 514.

---

[3] Although Defendants have not moved to dismiss the procedural due process claim on ripeness grounds, federal courts are required to consider *sua sponte* matters affecting their subject matter jurisdiction, including ripeness. *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265, n. 13 (1991) (ripeness "concerns our jurisdiction under Article III, so we must consider the question on our own initiative.").

[4] At least one court has suggested that the application of *Williamson County's* ripeness test is proper in the government contracting context.  *See Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016) (noting that the Federal Circuit has "applied a similar concept" to *Williamson County's* ripeness test "in cases where a party alleges a taking of a contract with the government.").

ARS's procedural due process claim arises from the same facts as its takings claim. According to the amended complaint, ARS's procedural due process claim stems from Defendants "termination, set-off, and transfer of the Contract" to International which "caused ARS to suffer a deprivation of rights due to the lack of procedural due process." (Compl. ¶ 110.) ARS's takings claim is based on the same facts: ARS alleges that the "Defendants terminated the Contract with a substantial amount of the contractual term remaining and took that term and gave it to" International, (*id*. ¶ 133) and that Defendants did so "without due process and just compensation." (*Id*. at ¶ 134.) These allegations show that ARS's procedural due process claim arises "from the same nucleus of facts" as ARS's takings claim. *See Kurtz*, 758 F.3d at 513. Therefore, *Williamson County* applies to ARS's procedural due process claims.

Under *Williamson County* and *Kurtz*, ARS's takings and procedural due process claims are unripe. While ARS did obtain a "final decision" from the state in the sense that DAS has terminated the Contract,[5] ARS cannot satisfy the second prong of the *Williamson County* test because its claim for compensation is still pending before the Connecticut Claims Commissioner.

*Williamson County's* second prong—known as the exhaustion requirement—provides that if a State has "a reasonable, certain, and adequate provision for obtaining compensation" for a

---

[5] I could find no Second Circuit decision holding that the government's termination of a contract with a private contractor constitutes a "final decision" under *Williamson County*. Nevertheless, the Supreme Court has emphasized that the rationale underlying the "final decision" factor is to ensure that a court can determine "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." *Williamson County*, 473 U.S. at 190; *see also Kurtz*, 758 F.3d at 512 (observing the "factors relevant to determining whether a taking has occurred are the economic impact of the state's actions and its interference with investment-backed expectations, and [those] factors cannot be evaluated until the administrative agency has arrived at a final, definitive position."). Here, the Court can readily assess the economic impact of the Contract's termination and the termination's interference with reasonable investment-backed expectations, suggesting that there has been a final, definitive decision. Therefore, the State's termination of the Contract constitutes a "final decision" under *Williamson County* and its progeny.

plaintiff's claim, then that claim is unripe until the plaintiff has unsuccessfully attempted to obtain compensation through the procedure provided by the State. *See Kurtz*, 758 F.3d at 512 (internal quotation marks omitted). Courts have routinely held that compensation procedures afforded by Connecticut law are "reasonable, certain, and adequate" within the meaning of *Williamson County*. *See, e.g.*, *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 380 (2d Cir. 1995) (holding that the Connecticut Constitution had "a straightforward takings clause" that could be used to recover compensation); *Webster v. Moquin*, 175 F. Supp.2d 315, 324 (D. Conn. 2001) (holding that Connecticut General Statute Section 22-326c "provides a procedure for making compensation claims for property destroyed to prevent the spread of avian influenza" and, therefore, was an adequate procedure under *Williamson County's* exhaustion requirement).  Further, the Second Circuit has held "that a state compensation procedure will be deemed available and adequate within the meaning of *Williamson* even when that procedure remains unsure and undeveloped." *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 99–100 (2d Cir. 1992); *see also Villager Pond, Inc.*, 56 F.3d at 380 (holding that "relief under a state compensation procedure must be attempted even where it remains unsure and undeveloped") (internal quotation marks and citation omitted). For example, the Second Circuit has "held that a takings claim was unripe where the plaintiff had not attempted to obtain compensation under the Vermont State Constitution's takings clause, even though no court ever had interpreted that clause to require compensation for a regulatory taking." *Id.* at 380; *see also Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 25 (1st Cir. 2011) ("Even where the most that can be said is that it remains unclear whether the inverse condemnation remedy applies to the type of taking alleged by the plaintiff, the state litigation requirement is not excused.") (internal quotation marks and citation omitted).   A plaintiff must exhaust "[s]o long as a remedy is *potentially* available under" state law. *Villager*

*Pond, Inc.*, 56 F.3d at 380 (emphasis added); *see also Komondy v. Gioco*, 59 F. Supp.3d 469, 478 (D. Conn. 2014) ("Therefore, so long as a remedy is potentially available under the state's constitution's provision, the plaintiff has not yet met the preconditions for a valid  takings claim." (internal quotation marks, internal brackets, and citation omitted)).

Connecticut law provides a "reasonable, certain and adequate provision for obtaining compensation" for ARS's claims regarding the State's termination of the Contract. *See Williamson County*, 473 U.S. at 194.  Specifically, Connecticut law provides that the Office of the Claims Commissioner "shall hear and determine *all* claims against the state" subject to certain exceptions inapplicable here.  Conn. Gen. Stat. § 4-142(a) (emphasis added).  The Claims Commissioner may order immediate payment of a claim, recommend to the General Assembly payment of a claim, deny a claim, or authorize a claimant to sue the State.  Conn. Gen. Stat. § 4-158(a).  ARS has filed a "[n]otice of [c]laim" with the Claims Commissioner that "has not been acted upon."  (Compl. at ¶ 94.)   Therefore, ARS's procedural due process claim is unripe because ARS must first "unsuccessfully attempt[] to obtain just compensation through the procedures provided by the State" before seeking relief in federal court.  *See Williamson County*, 473 U.S. at 195.  Whatever uncertainties might be involved in the proceeding before the Claims Commissioner, there is no doubt that it constitutes a "remedy…*potentially* available under state law," *Villager Pond, Inc.*, 56 F.3d at 380 (emphasis added)—a point ARS has effectively conceded by initiating the proceeding in the first place.

Although ARS does not address ripeness in its brief – even as to the ripeness challenge the Defendants make to the Takings Claim in their brief – it makes allegations in its amended complaint suggesting that the process provided under Connecticut law for the resolution of its claim is "inadequate" for purposes of *Williamson County's* ripeness test.  ARS alleges that "[t]he

multiple roles of the Claims Commissioner (as investigator and adjudicator) combined with his location of office space in CT-DAS and his sharing of CT-DAS staff poses a risk of bias and lack impartiality."  (Compl. at ¶ 95.)   ARS also alleges that "any claims authorized by the Claims Commissioner must be tried without a jury" (*id*), and the State has an "unduly burdensome and futile procedure to obtain a waiver."  (*Id*. at ¶ 96.)  The first of these allegations misstates the law, and courts are not required to accept such allegations on a motion to dismiss.  *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  There is nothing in the statutory regime governing the Office of the Claims Commissioner that suggests that it "investigat[es]" claims.  (Compl. at ¶ 95.)  To the contrary, the relevant statutes cast the Claims Commissioner as an adjudicator who hears claims initiated and prosecuted by a claimant and defended by the Attorney General or a state agency.  *See, e.g.*, Conn. Gen. Stat. § 4-142(a) (The Office of the Claims Commissioner "shall hear and determine all claims against the state."); § 4-147 ("Any person wishing to present a claim against the State shall file with the Office of the Claims Commissioner a notice of claim…"); § 4-149(a), (c) (directing that the Attorney General "shall review each claim" submitted to the Claims Commissioner and determine whether "protection of the state's interests" requires it to represent the State "before the Claims Commissioner" and "in appropriate cases" oppose such claim by "fil[ing] with the Office of the Claims Commissioner a notice of opposition"); § 4-151 (empowering the Claims Commissioner to conduct hearings); § 4-157 ( providing that at hearings the Claims Commissioner shall not be bound by any law or rule of evidence, except the rules of procedure adopted by the Claims Commissioner, which "shall provide a simple, uniform, expeditious and economic procedure for the presentation and disposition of claims"); § 4-158 (providing Claims Commissioner may "order that a claim be denied", "recommend to the General

14

Assembly payment of a just claim" or "authorize a claimant to sue the state"). The statutes also contradict the suggestion that the Claims Commissioner is somehow dependent on or structurally biased in favor of the DAS. *See* Conn. Gen. Stat. §4-142a (Claims Commissioner appointed by Governor with advice and consent of legislature); *id*.(b) (Office of Claims Commissioner shall be within DAS but "shall have independent decision-making authority."). They likewise do not support the suggestion that the DAS "share[s]" staff with DAS. *Id*.; *see also* §4-142(b) (DAS may *"provid[e]"* staff to the Office of the Claims Commissioner. (emphasis added)). Finally, I could find no authority for the notion that to be "adequate" under *Williamson County*, a state compensation procedure must include a jury trial, and at least one court has expressly rejected this notion. *Willis Smith & Co. v. Arkansas*, No. 4:08CV0006, 2008 WL 552814, at *2 (E.D. Ark. Feb. 27, 2008), *aff'd*, 548 F.3d 638 (8th Cir. 2008) ("Plaintiff's contention that a hearing before the Arkansas State Claims Commission is an inadequate and constitutionally impermissible remedy because the Commission does not provide jury trials is meritless."); *see also LeDuc v. Tilley*, No. 3:05CV157, 2005 WL 1475334, at *4 (D. Conn. June 22, 2005) (dismissing a plaintiff's takings claim on ripeness grounds because "though he filed a claim for property loss with Connecticut's Claims Commissioner" he nonetheless did "not allege that his claim ha[d] been fully and finally adjudicated as required by the Second Circuit.").

In short, none of ARS's allegations suggest that the proceeding before the Claims Commissioner is not a "reasonable, certain, and adequate provision for obtaining compensation" under *Williamson County*. I need not – indeed cannot at this stage – go further to determine whether the proceeding before the Claims Commissioner affords constitutionally satisfactory process for due process purposes. *Kurtz*, 758 F.3d at 516 ("if the only process guaranteed to one whose property is taken is a post-deprivation remedy, a federal court cannot determine whether

the state's process is constitutionally deficient until the owner has pursued the available state remedy.").  Because ARS has not alleged that there is no potential compensation remedy available to it under Connecticut law, and because it has not exhausted the available remedy, ARS's takings and procedural due process claims are unripe and must be dismissed.

ARS's substantive due process and equal protection claims, however, are not subject to the same analysis.  Although the Second Circuit has applied the *Williamson County* ripeness test to such claims, *see, e.g.*, *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002), it has not done so outside the land use context in any reported case this Court could find.  Further, in *Kurtz* the Second Circuit distinguished between substantive due process claims "alleging regulatory overreach," which must satisfy both the finality and the exhaustion requirements of *Williamson County*, and "substantive due process claims of arbitrary and capricious conduct," which "require only a showing of finality—there is no exhaustion requirement."  758 F.3d at 514.  ARS's substantive due process claim is premised on arbitrary and capricious conduct by the Defendants: ARS alleges "Defendants demonstrated their improper motive by engaging in conduct designed to appear as though ARS was being given its contractually required opportunity to cure it[s] alleged breach while, in actuality, the Defendants had no real intent to allow ARS to continue to perform under the Contract …."  (Compl. at ¶ 40.)  ARS further alleges the Defendants of engaging in a "well-orchestrated scheme to default and then terminate ARS," and asserts that the claimed deficiency of 8,619 tons of rock salt was a "pretext[]" for terminating the Contract.  (*Id.* at ¶ 42.)  ARS also alleges that "Defendants contact[ed] ARS's other customers complaining about performance" and "to discuss CT-DAS issues with ARS."  (*Id.* at ¶¶ 119, 146.)  Moreover, it alleges, "[u]pon information and belief," that "CT-DAS officials had a close business relationship with International," which had not been

16

the lowest bidder, and that "Defendants…executed a pre-determined plan and agreement to 'steer' ARS's Contract to International." (*Id.* at ¶ 43.)  These allegations make clear that ARS's substantive due process claim is based on arbitrary and capricious conduct by the Defendants and thus subject only to *Williamson County's* final decision prong.  *Kurtz*, 758 F.3d at 514.  That prong is satisfied here because, as noted above, the State terminated the Contract.  ARS's substantive due process claim is, therefore, ripe.

The same is true of the equal protection claim.  In *Dougherty*, the Second Circuit stated that "[t]he ripeness requirement of *Williamson,* although announced in a takings context, has been extended to equal protection and due process claims *asserted in the context of land use challenges*."  282 F.3d at 88 (emphasis added).  More recent formulations of the doctrine have retained this qualification.  *See, e.g.*, *Dreher v. Doherty*, 531 F. App'x 82, 83 (2d Cir. 2013) ("Land use challenges, whether pursued as a takings claim under the Fifth Amendment or as violations of equal protection or due process, are subject to the ripeness requirement articulated by the Supreme Court in [*Williamson County.*]").  I could find no Supreme Court or Second Circuit case holding, more generally, that any equal protection claim that overlaps with a takings claim in any context is unripe.  Moreover, what the Second Circuit said in *Dougherty* about the plaintiff's First Amendment claim in that case is true of ARS's equal protection claim in this one: "[ARS's equal protection claim] is based upon an immediate injury.  [ARS] suffered an injury at the moment the defendants [terminated the Contract and purchased salt from ARS's competitor, International], and [ARS's] pursuit of a further administrative decision would do nothing to further define [its] injury."  282 F.3d at 90.  ARS's alleges that the equal protection violation involved not only the State's decision to terminate the Contract but also its decision to replace ARS with International.  While the proceeding before the Claims Commissioner may

further refine ARS's financial injury from termination, it will not address any harm suffered due to the alleged discriminatory treatment. That harm – if it exists – occurred when the State replaced ARS with International and is, therefore, ripe. [6]

### B.     Rule 12(b)(6): The Individual Capacity Claims Fail to State A Claim

Although the Court lacks jurisdiction over the procedural due process claim, I nonetheless discuss how I would rule on the Rule 12(b)(6) motion addressed to that claim if the Court had jurisdiction. I also address the Rule 12(b)(6) motion as to the remaining two individual capacity claims for violations of substantive due process and equal protection. Because my conclusions as to all of these claims turn in large part on my determination that ARS lacked a property or liberty interest in the Contract, I begin with a discussion of that issue in the context of the procedural due process claim.

### 1.     Count 2: Procedural Due Process Claim

ARS claims that Defendants "have deprived [ARS] from its procedural due process rights…under the Fourteenth Amendment." (Compl. at ¶ 88.)

To state a claim for violation of procedural due process, ARS must allege (i) that "there exists a liberty or property interest of which [ARS] has been deprived", and (ii) that the "procedures followed by the State were constitutionally" deficient. *See Victory v. Pataki*, 814

---

[6] Defendants also argue this action should be stayed or dismissed under the prior pending action doctrine because ARS sued Defendants in Connecticut Superior Court and filed a notice with the Connecticut Claims Commissioner before filing its complaint in this action. (ECF No. 19 at 11.) The Connecticut Superior Court action has since been dismissed, however, and the prior pending action doctrine, in any event, does not apply when the prior pending action is a state court action. *Cupe v. Lantz*, 470 F.Supp.2d 128, 132 (D. Conn. 2007) ("This doctrine is applicable where there are two identical or similar actions contemporaneously pending in two *federal* courts.") (quotation marks and citation omitted) (emphasis in original). The prior pending action doctrine is no bar to the proceedings here.

F.3d 47, 59 (2d Cir. 2016) (internal quotation marks and citation omitted).  Accordingly, the threshold inquiry is to determine whether ARS had a property or liberty interest in the Contract with the State.

### a.      Property Interest

"Property interests protected by due process ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *MacFall v. City of Rochester*, 495 Fed.App'x 158, 159 (2d Cir. 2012) (internal quotation marks and citation omitted).  "To establish such an interest, [ARS] must show that [it] had a legitimate claim of entitlement to the interest as opposed to a mere unilateral expectation."  *Id.* (internal quotation marks and citation omitted).  Here, ARS asserts that it has a property interest both in not being terminated for cause and in prompt payment under the Contract. (Compl. at ¶¶ 76–77; ECF No. 25 at 17–18 ("Opp. Mem."))

### i. Whether ARS has a property interest in not being terminated for default

In *S&D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962 (2d Cir. 1988), on which ARS and the Defendants rely, the court addressed "the circumstances under which a governmental contract may be said to create a property interest protected by procedural due process."  *Id.* at 963.  There, after S&D Maintenance Co., Inc. ("S&D"), entered into contracts to maintain New York City's parking meters, the City withheld payments pending a criminal investigation into the circumstances under which S&D obtained one of the contracts, and ultimately terminated the contracts.  *Id.* at 964.  S&D sued, claiming that the City had violated its procedural due process rights by depriving it of, among other things, a property interest in the "right to continue rendering service" under the contracts with the City.  *Id.* at 967.  The Second Circuit compared S&D's service

contract to an employment contract, noting that "[i]n the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause*." *Id*. (emphasis in original). S&D's contract with the City included provisions allowing both termination for default – in which case the City had to provide notice and a hearing before declaring the contractor in default – and termination without cause. The court concluded that S&D had no "property interest in having its services retained through the term of the contract but only a property interest in not being terminated on the grounds that it [was] in default." *Id*. at 968. The court's conclusion that there was a property interest in not being terminated for default was based on "the fact that a contractor who has defaulted ... may become ineligible as a bidder on future [City] contracts for a period of three years" under the City's charter. *Id*. By including the termination for default provision in its contract with S&D, "the City acknowledged that this consequence of future ineligibility was sufficiently serious to warrant a requirement of good cause, thereby creating a limited protected interest in non-termination because of default." *Id*. Although the City had initially sought to terminate the contract for default, it had ultimately terminated the contract under the without cause termination provision. *Id*. The court held that S&D's contractual relationship with the City did not create a constitutionally protected property interest. *Id*.

ARS argues that, like S&D, it had a property interest in not being terminated for default and that, unlike S&D, it *was* terminated for default. (Compl. at ¶¶ 73–74; Opp. Mem. at 17–18.) The problem with this argument is that the severe "consequence of future ineligibility" attaching to default under the contract in *S&D Maintenance Co.*, which was critical to the court's finding of a "limited property interest in non-termination because of default," 844 F.2d at 969, is entirely absent here. *See Malapanis v. Regan*, 340 F.Supp.2d 184, 191 (D. Conn. 2004) ("*S & D*

20

*Maintenance's* holding is not so broad as to transform any contractual provision allowing termination for nonperformance, or failing to provide for unconditional termination, into a property right."). There are no allegations that the termination for breach of contract rendered (or could render) ARS an "ineligible bidder" under any Connecticut law for any Connecticut state contract for any amount of time. Nor is there any language in the contract suggesting that ARS would face "future ineligibility" or other similar consequences in the event of a termination for breach. (*See* ECF No. 13-3.)

ARS asserts that it has suffered "serious consequences" from the termination in this case (Opp. Mem. at 18), but the only allegations in its amended complaint relating to this assertion are conclusory allegations that "[t]he wrongful termination of ARS's Contract is a constructive debarment" and "ARS has been stigmatized and any potential future applications for state of Connecticut contracts will be considered negatively by the termination." (Compl. at ¶ 69.) ARS points to no authority under which the State could "debar" it from participating in bids for State contracts merely for (allegedly) breaching its Contract with the State, and ARS alleges no facts suggesting that it has been prevented – formally by law or through informal communications of a State official – from submitting bids for State contracts. That leaves only the vague notion that ARS is less likely to win future business from the State of Connecticut because of its poor performance on the Contract (in the eyes of the State) and that "termination for cause from a state contract hurts ARS's reputation in the salt producer community which is very small so word travels quickly."[7] ARS cites no authority suggesting that such routine fallout from a business dispute with a governmental entity warrants the recognition of a property interest in the government contracting

---

[7] This quotation is taken not from the amended complaint but from an affidavit by ARS's marketing manager submitted with its brief. (ECF No. 25-3 at 32.) Even if it were in the amended complaint, however, it would not alter my conclusion.

context, and the authority in this Circuit points in the opposite direction. *See e.g.*, *Grasson v. Bd. of Educ. of Orange*, 24 F.Supp.3d 136, 150 (D. Conn. 2014) ("Courts in the Second Circuit have been reluctant to expand due process protections to ordinary commercial contracts."); *E. Amherst Plumbing, Inc. v. Thompson,* No. 12–CV–195, 2013 WL 5442263, at *5 (W.D.N.Y. Sept. 27, 2013) ("[T]he Second Circuit has avoided extending procedural due process protections to property interests...[in] commercial contract[s]."); *35–41 Clarkson LLC v. N.Y.C. Hous. Auth.,* No. 11–CV–6770, 2012 WL 5992094, at *5 (S.D.N.Y. Nov. 30, 2012) (distinguishing "one-off commercial interactions" from "entitlements subject to protection under the Due Process Clause"); *Ganci v. N.Y.C. Transit Auth.,* 420 F.Supp.2d 190, 202 (S.D.N.Y.) (concluding that a "routine contract between a provider of services and its customers, analogous to other commercial arrangements in which funds are advanced prior to the provision of a service," did "not give rise to protected property interests in the Due Process context"), *aff'd,* 163 Fed.Appx. 7 (2d Cir. 2005); *see also Malapanis*, 340 F.Supp.2d at 191(refusing to recognize property interest in supply contract with State of Connecticut in part because, "while the Second Circuit's analogy to employment contracts in *S&D Maintenance* may have been apt, because the meter maintenance contract was for the performance of the service of maintaining the city's on-street meters, the employment analogy has only a tenuous connection to the supply contract.") (citation omitted). I conclude that ARS has failed to allege a property interest in non-termination of the Contract.

ii. *Whether ARS has a property interest in prompt payment*

"It is well established that a contractor has a right to timely payment for work it performs under a contract with a state agency, and that such right is a property interest protected by the due process clause." *Christ Gatzonis Electrical Contractors, Inc. v. New York City School Constr. Authority*, 23 F.3d 636, 639 (2d Cir. 1994). "This property interest, however, arises only where

there exists a contractual or state law entitlement to prompt payment." *Id*. (internal quotation marks and citation omitted).   Here, ARS argues that both the Contract and Connecticut law create entitlements to the nearly $800,000 it claims to be owed.  (Compl. at ¶¶ 76–77.)

In assessing whether a property right for prompt payment exists under a contract, courts consider whether the contract affords the state agency "substantial latitude in approving and making payments."  *Gatzonis*, 23 F.3d at 639.   In *Christ Gatzonis Electrical Contractor, Inc. v. New York School Construction Authority*, 23 F.3d 636, 639 (2d Cir. 1994), the Second Circuit considered a contractor's claim that it had a property right to prompt payment under its contracts with New York's school construction authority.   The contractor relied on a provision that read, "the Authority shall pay the contractor the costs actually incurred by the Contractor up to the effective date of such termination."  *Id*. The court also considered, however, two other contractual provisions.   The first "expressly reserve[d] to the [school authority] the right to approve only those costs distributions which, in the [school authority's] opinion, are reasonable, equitably balanced and correspond to the quantities in the documents."  *Id*.   The second provided that the school authority could withhold the balance due to "an amount necessary to satisfy any and all claims…against the contractor."  *Id*.   Addressing the latter provision, the Court noted that "the power of set-off in the…contracts affords the [school authority] substantial latitude in approving and making payments."  *Id*.   Based on those provisions, the Second Circuit concluded, "the contracts cannot be said to confer upon Gatzonis Electric an entitlement to prompt payment."  *Id*. at 640.

A similar analysis disposes of ARS's claim of a property interest in prompt payment under the Contract.  ARS relies on the following contractual provisions to demonstrate it has a property interest in prompt payment of the amount it claims is due:

Section 4(b): Payment shall be made only after the Client Agency receives and accepts the Goods or Services and after it receives a properly completed invoice.  Unless otherwise specified in the Contract, payment for all accepted Goods or Services shall be due within forty-five (45) days…

_____

Section 9(e): The Client Agency shall, within forty-five (45) days of the effective date of the Termination, reimburse the Contractor for its Performance rendered and accepted by the Client Agency in accordance with Exhibit A.1 and A.2, in addition to all reasonable costs incurred after Termination in completing those portions of the Performance which the notice required the Contractor to complete.

(ECF No.13–3 at 11).[8]

The Contract also includes, however, the following set-off provision:

[T]he state, in its *sole discretion*, may setoff (1) any costs or expenses that the State incurs resulting from the Contractor's unexcused nonperformance under the Contract and under any other agreement or arrangement that the Contractor has with the State and (2) any other amounts that are due or may become due from the State to the Contractor, against amounts otherwise due or that may become due to the Contractor under the Contract, or under any arrangement that the Contractor has with the State.

(ECF no. 13–3 at 15) (emphasis added).  This provision substantially qualifies any right ARS has to prompt payment of the "approximately $800,000" it claims, which is also the amount of the set-off.  (Compl. ¶¶ 47–49.)  ARS cannot be said to have a "clear entitlement" to the set-off amount when the amount is within the "*sole* discretion" of the Defendants.  The set-off provision here is comparable to the one in *Gatzonis*.  It confers "substantial latitude" upon the State with respect to the set-off payment.  *See Gatzonis*, 23 F.3d at 639.  Therefore, the Contract gives ARS no property interest in prompt payment of the set-off amount.  *See id.*

ARS's statutory theory that it is entitled to prompt payment fails as well.  ARS argues that Sections 4a-71 and 4a-72 of the Connecticut General Statutes entitle it to prompt payment of the

_____

[8] I may consider the Contract in adjudicating Defendants' motion to dismiss because ARS attached the Contract to its amended complaint.  *See Chambers*, 282 F.3d at 152 ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citation omitted).

24

set-off amount.  (Compl. ¶¶ 77).  These statutes, however, do not confer such a right.  Section 4a-71 requires the State to pay *interest* whenever it "fails to make timely payment" and defines when a payment is considered "timely" between a state agency and a contractor.  **Conn. Gen. Stat. § 4a-71**.  Specifically, the law defers to the contract between the parties as to when payment will be due (which here, for the set-off amount, is within the State's discretion), and thus does not vest ARS with a clear entitlement to the amount it seeks.  Indeed, the only amount that Section 4a-71 addresses is interest due for past payments, not the past payments themselves.  *Id*.  But even the interest provision would be unhelpful to ARS, were it applicable.  The payment of interest is subject to a litany of exceptions enumerated in Section 4a-72.  One such exception is for "good faith dispute[s]", which include "contention[s] by the state that the goods delivered" were "of less quantity or quality than ordered or specified by contract" or "*any other reason* giving cause for the withholding of payment."  **Conn. Gen. Stat. § 4a-72 (emphasis added)**.  These expansive grants of discretion undercut any claim ARS could make even to interest on the set-off amount under the Contract.  Other courts considering similar statutory provisions have found that they do not create a property interest in prompt payment.  *See TADCO Const. Corp v. Dormitory Auth. of State of New York*, 700 F. Supp. 2d 253, 264 (E.D.N.Y. 2010) ("That law, however, does not create a clear entitlement to prompt payment, but rather mandates that interest be paid by any public authority that does not promptly pay its contractors according to its established policy.").  ARS has not shown a "clear entitlement" to either the set-off payment or even to interest on such amount.

ARS has not plausibly alleged facts suggesting that it had a property interest either in not being terminated for default or in prompt payment of the set-off amount.

### b.     Liberty Interest

ARS also claims that Defendants' actions deprived it of a liberty interest because "the termination impacts its ability to obtain future business opportunities" and had a "negative impact upon ARS's business reputation in the salt producer community as a whole which impacts other business opportunities with customers."  (Opp. Mem. at 14.)  Specifically, ARS alleges that Defendants' statements have harmed "[ARS's] ability to bid on future CT-DAS procurements without any stigma."  (Compl. at ¶ 89.)  According to ARS, Defendant Wilson in her letter made "disparaging statements" about ARS.  (*Id*. at ¶ 47.)  ARS further contends that Defendants "contact[ed] ARS's other customers complaining about [its] performance" under the Contract.  (*Id*. at ¶ 119.) ARS charges that the Defendants "acted intentionally and with evil motive" in depriving ARS of the Contract (*id*. at ¶ 82), and that their actions were "unlawful," "dishonest, wanton, reckless overreaching, [and] coercive."  (*Id*. at ¶ 80.)  ARS claims this conduct has caused "ARS [to be] stigmatized and any potential future applications for state of Connecticut contracts will be negatively considered by the termination", (*id*. at ¶ 69), and resulted in "a constructive debarment" of ARS.  (*Id*. at ¶ 68).

"A [Section] 1983 liberty interest claim of this sort – commonly referred to as a 'stigma plus' claim – requires a plaintiff to allege (1) the utterance of a false statement about her that is injurious to her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005); *see also O'Connor v. Pierson*, 426 F.3d 187, 195 (2d Cir. 2005) (referring to the injurious false statement as the "stigma" and the state-imposed material burden as the "plus").  Mere "allegations of professional incompetence do not implicate a liberty interest."  *Donato v. Plainview–Old Bethpage Cent. School Dist.,* 96 F.3d 623, 630–31

(2d Cir. 1996).   Rather, the allegations must "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a manner as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." *Id*.

I could find no Second Circuit case holding that the termination of a supply contract by the government is sufficient to give rise to a stigma-plus claim by the supplier.   In any event, ARS does not plead any facts suggesting that Defendants made any false statements about it.   Indeed, ARS does not dispute the accuracy of the core claim of breach Defendants made against it: that ARS failed to deliver the 8,619 tons of salt.   (*Id*. at ¶ 33.)   ARS's allegations concede that it did not deliver the requisite amount by alleging that Defendants did not provide ARS "the proper ten (10) day cure period", (*id*. at ¶ 35), and that the Defendants rejected "the options presented by ARS representatives" (*id*. at ¶ 39) to "cure [the] alleged salt deficiency."   (*Id*. at ¶ 40.) ARS's allegations that its failure to deliver the salt should have been excused likewise concede that there was a salt deficiency.   (*Id*. at ¶ 44 ("(i) force majeure events [which] caused delays; (ii) [] that contemporaneous photographs illustrated that DOT stockpiles were full; (iii) that [Defendants] purchased twice the amount of the alleged salt "deficit...and (iv) that the Defendants purchased salt in the open market <u>prior</u> to the end of the contractual cure period." (emphasis in original.)) While ARS alleges that it "had actually shipped and the DOT [had] received" an amount that was "three (3) times...the alleged 'salt deficiency'" over the Contract period, this allegation does not dispute that there were still 8,619 tons of salt that were never delivered.   (*Id*. at ¶ 53.)

Nor does ARS allege that Defendants' statements to ARS's customers about ARS's performance were false.   Furthermore, ARS does not challenge the falsity of the "disparaging" statements made in Defendant Wilson's letter to ARS − statements that were, in any event, not

made to third parties.  *See Donato*, 96 F.3d at 631 ("Stigmatizing statements by the government about an employee upon her discharge only implicate a liberty interest when there is also public disclosure.").  As ARS's amended complaint does not allege that the Defendants' statements about ARS's delivery of the salt were false, ARS's stigma-plus claim fails.  *See Malapanis*, 340 F.Supp.2d at 193 (holding that the plaintiff's liberty interest claim failed because plaintiff's complaint did not "challenge the falsity of the core charges claimed to have been the basis of the non-responsible designation"); *see also O'Connor*, 426 F.3d at 195 (finding district court properly held that "[plaintiff] had not alleged the utterance of any false statement and that his stigma-plus claim therefore necessarily failed").

Even if ARS had adequately alleged falsity, its stigma plus claim would fail.  ARS's allegations—that Defendants made "disparaging statements" to ARS (*Id*. at ¶ 47), and "contact[ed] ARS's other customers complaining about [its] performance" (*Id*. at ¶ 119)—fall short of statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession."  *Donato*, 96 F.3d at 630–31.  At most, those allegations amount to "vague statements of unspecified incompetence."  *Id*. at 631.  Furthermore, ARS's allegation that it has been "stigmatized and any potential future applications for state of Connecticut contracts will be negatively considered by the termination" is conclusory, and without more, is not a basis to infer that Defendants placed a "significant roadblock" in ARS's ability to continue its business.  *See e.g.*, *Srinivas v. Picard*, 648 F. Supp.2d 277, 290 (D. Conn. 2009) (concluding that plaintiff had not pled facts of a "significant roadblock" because she merely "alleged in conclusory terms that her reputation has been 'damaged,' and that the defendants' actions led to the 'destruction of her career'"); *TADCO Const. Corp.*, 700 F. Supp.

2d at 265 ("conclusory allegations that a plaintiff's reputation has been damaged, that a plaintiff's career has been destroyed or that a substantial roadblock has been placed in a plaintiff's ability to continue its profession are insufficient to withstand a motion to dismiss.").[9]

### 2.    Count 1: Substantive Due Process Claim

ARS claims that it "should have been afforded substantive due process prior and subsequent to the deprivation [of the Contract] by Defendants."  (Compl. at p. 26.)

"[T]he Due Process Clause of the Fourteenth Amendment embodies a substantive component that protects against certain government actions regardless of the fairness of the procedures used to implement them." *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996) (internal quotation marks and citation omitted).  Substantive due process protections extend only to those interests that are "implicit in the concept of ordered liberty", *Palko v. Connecticut*, 302 U.S. 319, 325 (1937), and to "right[s]… so rooted in the traditions and conscience of our people as to be ranked fundamental." *Reno v Flores*, 507 U.S. 292, 303 (1993) (internal quotation marks omitted).  To state a substantive due process claim, a plaintiff must allege that "(1) it had a valid property interest ...; and (2) defendants infringed on that property right in an arbitrary or irrational manner." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 545 (2d Cir. 2014) (internal quotation marks and citation omitted).  Only the most egregious conduct can be said to be arbitrary or irrational, and

---

[9] The repetition of these allegations in affidavits filed by ARS's employees with its brief in opposition to the motion to dismiss does not change the analysis.  (*See* ECF No. 25-3 at ¶¶ 29, 32) ("Also, our clients, such as New York OGS, were contacted by CT-DAS officials about the alleged performance issues.  This intentional conduct hurts our reputation…. A termination for cause from a state contract hurts ARS's reputation in the salt producer community which is very small so word travels quickly.")  There are no facts set forth in any of ARS's papers regarding what aspects of ARS's "performance" Defendants discussed with ARS's customers, let alone facts showing that such discussions have so damaged ARS's reputation as a supplier of rock salt as to place a "significant roadblock" in its ability to continue in that business.

the conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Velez*, 401 F.3d at 93 (internal quotation marks omitted).

Here, ARS contends that its substantive due process rights were violated when Defendants deprived it of the Contract. As shown above, however, ARS has failed to allege a property interest, and the Second Circuit has repeatedly held that "simple, state-law contractual rights, without more, are not worthy of substantive due process protection." *Local 342, Long Island Pub. Serv. Employees, UMD, ILA, AFL-CIO v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994). ARS's interest in a supply contract is categorically different than the fundamental rights traditionally protected by substantive due process such as "the individual freedom of choice with respect to certain basic matters of procreation, marriage, and family life." *See Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198, 99 S. Ct. 1062, 1064, 59 L. Ed. 2d 248 (1979) (holding that "because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection"); *see also Town of Huntington*, 31 F.3d at 1196 (holding that Union's contractual claim for payment did not implicate the "important interests that have heretofore been accorded the protection of substantive due process") (internal quotation marks omitted). As the Second Circuit observed, "routine state-created contractual rights are not deeply rooted in this Nation's history and tradition, and, although important, are not so vital that neither liberty nor justice would exist if they were sacrificed." *Id.* (internal quotation marks and citation omitted). Because ARS has failed to allege a property or liberty interest in the Contract, the "[Defendants'] termination of the [Contract] in no way violated the substantive due process rights of [ARS]." *Town of Huntington*, 31 F.3d at 1196.

Even assuming ARS's interests were considered fundamental, the Defendants' alleged conduct in depriving ARS of those interests was not so shocking, arbitrary, or egregious to trigger substantive due process protections.  ARS alleges that the "CT-DAS officials had a close business relationship with International", and that "Defendants… executed a pre-determined plan and agreement to 'steer' ARS's Contract to International."  (Compl. at ¶ 43.)  ARS further alleges that Defendants' had an "evil motive" (*id*. at ¶ 82) and that their "acts were dishonest, wanton, reckless[ly] overreaching, [and] coercive", (*id*. at ¶ 80), done "to deprive ARS of its contractual rights", (*id*. at ¶ 82), and culminated in "ARS [being] treated differently" than International.  (*Id*. at ¶ 118.)  But most of these allegations are conclusory.  As for the factual allegations in the amended complaint, none suggest conduct "so egregious, so outrageous, that [it] may fairly be said to shock the contemporary conscience."  *See Velez*, 401 F.3d at 94.  Although ARS alleges that the defendants "intentionally…deprive[d] ARS of its contractual rights," (*id*. at ¶ 82), this is a far cry from a "malicious and sadistic abuse[] of power by [Defendants]."  (*See id*.)

### 3.   Count 3: Equal Protection Claim

ARS claims a violation of the Equal Protection Clause because "[it] was treated differently than the other similarly situated state vendor, specifically International."  (Compl. at ¶118.)  ARS contends that it was "treated differently by the unequal application of standard state contract and law", which culminated in Defendants' "removing ARS from its Contract and transferring its rights to International."  (Compl. at ¶119.)  The amended complaint does not make any allegations that ARS was a member of a "suspect" or "quasi-suspect" class or any other class.

The Fourteenth Amendment states that "[n]o State shall ... deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "A plaintiff who

does not claim to be a member of a constitutionally protected class may bring an Equal

Protection claim on one of two theories: selective enforcement or 'class of one.'" *Missere v.*

*Gross*, 826 F.Supp.2d 542, 560 (S.D.N.Y. 2011) (citation omitted).  To state a claim of selective

enforcement, ARS must allege "both (1) that [it] was treated differently from other similarly

situated businesses, and (2) that such differential treatment was based on impermissible

considerations such as race, religion, intent to inhibit or punish the exercise of constitutional

rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc. v. Town of Henrietta*,

507 F.3d 778, 790 (2d Cir. 2007) (internal quotation marks and citations omitted).  To state a

"class-of-one" claim, ARS must allege that it "has been intentionally treated differently from

others similarly situated and that there is no rational basis for the difference in treatment." *Ruston*

*v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010) (internal quotations

omitted).

   "While a plaintiff is not required to proffer evidence of similarly situated [comparators]

at the motion to dismiss stage, the court still must determine whether, based on a plaintiff's

allegations in the complaint, it is plausible that a jury could ultimately determine that the

comparators are similarly situated." *Tower Properties LLC v. Vill. of Highland Falls*, No. 14-

CV-04502 NSR, 2015 WL 4124499, at *8 (S.D.N.Y. July 7, 2015).  "[C]lass-of-one plaintiffs

must show an extremely high degree of similarity between themselves and the persons to whom

they compare themselves." *Ruston*, 610 F.3d at 59 (internal quotation marks and citation

omitted).  Many district "courts have applied a slightly less stringent similarly situated standard

in the selective enforcement context," than in the class-of-one context.  *Mosdos Chofetz Chaim,*

*Inc. v. Vill. of Wesley Hills*, 815 F.Supp.2d 679, 696 (S.D.N.Y.2011).  This lower standard

requires "plaintiffs to show that plaintiff and comparators were similarly situated in all material respects, or that a prudent person, looking objectively at the incidents, would think them roughly equivalent." *Missere,* 826 F.Supp.2d at 561 (internal citations and quotation marks omitted).

ARS's allegations do not satisfy either of these standards. First and foremost, the amended complaint suggests that ARS and International were *not* similarly situated in January 2014 in a critical respect: International could satisfy the State's salt needs, and ARS could not. While ARS does not actually allege this, once the conclusory allegations about "improper motive" (Compl. at ¶ 40) and "steer[ing]" (*id.* at ¶ 66) are stripped away, this appears to be the only plausible inference to draw from the allegations about the State's decision to pay an alternative supplier more than it was paying ARS to supply salt at a time that ARS itself was unable to meet the State's needs.  Indeed, the amended complaint refers to the State's "exercise of 'cover'" under the Contract (*id.* at ¶ 83), and the Contract includes a provision allowing the State to purchase "on the open market Goods … to replace those which have … not [been] delivered ….."  (ECF No. 13-3 at ¶ 13.)  While ARS alleges that the State's invoking of this provision was improper, and in breach of the Contract, its allegations suggest that the State did so because it was "demand[ing] shipments" and "needed rock salt" from ARS and concluded – wrongly according to ARS – that ARS was in breach of the Contract by failing to meet those demands.  (Compl. at ¶¶ 30-31, 36, 42, 59).

In any event, the amended complaint does not otherwise allege that ARS and International were so similarly situated as to meet the stringent standards that apply to equal protection claims not based on a suspect or quasi-suspect classification.  There are no allegations, for example, that the companies shared similar customer bases, geographic markets, financial profiles, distribution and logistics capabilities, performance histories, regulatory obligations,

production capacities, inventories, or number of employees.  Nor are there any allegations that International (or any other comparator) breached a similar contract and, upon doing so, was *not* terminated or declared in breach or was otherwise treated differently than ARS.  It is not enough for ARS to allege that International is in the same industry.  *See, e.g.*, *Kabrovski v. City of Rochester, N.Y.*, 149 F. Supp.3d 413, 423 (W.D.N.Y. 2015) (holding that plaintiff's allegation "that the comparator business establishments ha[d] live outdoor amplified music and [were] located within the City of Rochester" was insufficient to plead that they were similarly situated under a class-of-one theory).

Second, assuming that ARS and International are similarly situated, the amended complaint fails to allege facts showing that, for ARS's class-of-one claim, "there is no rational basis for the difference in treatment" between ARS and International.  As noted above, one plausible reason for the difference was International's ability to deliver salt at a time that ARS could not.  *Ruston*, 610 F.3d at 58 (internal quotation marks and citation omitted).  Further, with regard to ARS's selective enforcement claim, the conclusory allegations that Defendants "acted intentionally and with evil motive…to deprive ARS of its contractual rights" (Compl. at ¶ 82) and "desired to transfer ARS's contractual benefits to International without complying with [the] procurement process", (*id*. at ¶ 118) are insufficient to raise a plausible inference that the Defendants acted on "impermissible considerations", or the with the "intent to inhibit or punish the exercise of constitutional rights," or in "bad faith."  *See Cine SK8, Inc.*, 507 F.3d at 790.  There are simply not enough facts pled to support such an inference.  Thus, ARS's equal protection claim fails.

### C.      Remaining Issues

#### 1.      Count 5: CUTPA Clam

Because I am dismissing all of the federal claims, I decline to exercise supplemental

jurisdiction over ARS's CUTPA claim.  28 U.S.C. §1367(c)(3); *Astra Media Grp., LLC v. Clear*

*Channel Taxi Media, LLC*, 414 Fed.Appx. 334, 337 (2d Cir. 2011) ("[W]e have generally held

that where all the federal claims have been dismissed at a relatively early stage, the district court

should decline to exercise supplemental jurisdiction over pendent state-law claims.").

#### 2.      ARS's Affidavits and Letter Attached to its Opposition Memorandum

ARS attaches to its brief in opposition to Defendants' motion to dismiss the affidavits of

Gunther Buerman (Chairman of ARS's Board of Managers), Justin Curley (Stockpile Manager of

ARS), Jamie McClain (Marketing Manager of ARS), and a letter from Ann Blake (Chief

Administrative and Financial Officer) to Defendants (the "ARS Affidavits and Letter").  These

affidavits and letter were not previously submitted to the Court.

"In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to

facts stated on the face of the complaint."  *Leonard F.*, 199 F.3d 99, 107 (2d Cir. 1999).  "[T]he

complaint is deemed to include any written instrument attached to it as an exhibit or any statements

or documents incorporated in it by reference."  *Chambers*, 282 F.3d at 152 (internal quotation

marks and citation omitted).  "[W]here a document is not incorporated by reference, the court may

nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders

the document integral to the complaint."  *Id.* (quotation marks and citation omitted).

Here, the ARS Affidavits and Letter were not attached to, incorporated by reference in, or

relied on by ARS in its amended complaint.  Therefore, I cannot consider the ARS Affidavits and

Letter in ruling on Defendants' motion to dismiss.  In any event, I have reviewed the ARS

Affidavits and Letter and conclude that even if I could consider these materials, there would not be grounds to allow ARS to amend its complaint further.[10]  The affidavits and letter add little to the amended complaint and, on the critical points, essentially restate the conclusory allegations made in the amended complaint.  For example, the affiants swear that: "[They] believe that the officials have acted intentionally and in bad faith" (ECF No. 25-1 at ¶ 23), "[t]he defendants' conduct constructively and actually negatively impacted ARS's status as a qualified and responsible bidder" (ECF No. 25-1 at ¶ 40), "ARS's clients, such as New York OGS, were contacted by CT-DAS officials about the alleged performance issues" (ECF No. 25-3 at ¶ 29), "[the] termination for cause from a state contract hurts ARS's reputation in the salt producer community which is very small so word travels quickly" (ECF No. 25-3 at ¶ 32), and "ARS, as a result of the CT-DAS's termination 'for cause' suffered damage to [its] reputation and [its] status a responsible bidder."  (ECF No. 25-2 at ¶ 21.)  Even if the statements made in the ARS Affidavits and Letter appeared in the amended complaint, they would not alter my conclusions.

**V. Conclusion**

    For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss.  The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/_____<br>Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              January 6, 2017

_____

[10] I note that ARS has not filed a motion to amend its amended complaint, and the Court has already stated that it would not allow further amendments.  (*See* ECF No. 12.)